Gerald **SCHLOSSBERG** and Marshall Schlossberg, d/b/a Acme Iron & Metal Company, Plaintiffs,

v.

**KOEHRING COMPANY,** a Wisconsin corporation, Defendant.

Civ. A. No. 67–C–179.

United States District Court,
E. D. Wisconsin.

Nov. 15, 1971.

Ben L. Chernov, Milwaukee, Wis., and Thomas D. Mantel, Indianapolis, Ind., for plaintiffs.

William A. Denny, and F. Kristen Koepcke, Milwaukee, Wis., for defendant.

## OPINION AND ORDER

REYNOLDS, District Judge:

This diversity action arises out of the alleged malfunction of a crane carrier which was manufactured by a division of the defendant corporation and sold by one of defendant's distributors to plaintiffs on October 25, 1965.

The complaint alleges that recovery may be had on one of four theories: breach of express warranty, breach of implied warranty, misrepresentation, and negligence in the manufacture of the carrier unit. The defendant has counterclaimed for a declaratory judgment that the malfunction of the carrier unit was not attributable to any of the reasons set forth in plaintiffs' causes of action. I have concluded that the malfunction complained of was not due to any of the reasons set forth in the plaintiffs' complaint.

Gerald Schlossberg and Marshall Schlossberg operate a business known as Acme Iron & Metal Company (hereafter "Acme"), a partnership, in Anderson, Indiana, engaged in the metal salvage and recovery business. In connection with their business, they require the use of cranes and carriers to transport the cranes to the various job sites at which they operate. When the cranes and carriers are not necessary for their own business purposes, they are from time to time rented to others for a fee.

The defendant Koehring Company is a Wisconsin corporation. Its Schield-Bantam Division is located in Waverly, Iowa, and manufactures cranes and crane carriers.

During the year 1965, prior to October 25, 1965, Acme decided to purchase a mobile crane for use primarily at on-the-site railroad derailment work. Prior to purchasing the crane and carrier unit in question, the plaintiffs had investigated other products of a similar nature manufactured by other manufacturers

and obtained brochures published by the manufacturers, including those of defendant. The brochures published by Koehring Company contained the following statements referring to the Schield-Bantam Model 306 carrier:

"Pick up work where others its size quit."

"Move into and out of the toughest ground conditions easily with Bantam's rugged 6 x 6 drive."

"Carries an unconditional six-month warranty against defective parts and workmanship."

"The Model 306 carrier is designed and built by Bantam craftsmen specifically for mounting of the Bantam T350 basic unit. This assures perfect balance of carrier and base to give maximum lifting stability * * * high speed excavator service and fast job to job moves with a minimum of total gross weight."

"Fast travel under all job conditions."

"Normal highway speed 40 miles per hour."

"Plus the high speed mobility for pick-up work."

"Bantam makes every job accessible, gets to it faster, finishes it quicker."

"Bantam-built rugged, dependable."

"Highest earning power."

"Lowest operation and maintenance cost."

George McLean, d/b/a General Equipment & Machine Co. of South Bend, Indiana (hereinafter "General"), was at the time of the transaction herein mentioned a distributor of Schield-Bantam products under a written agreement with Koehring Company dated March 15, 1965. That agreement, in part, provided:

"(a) Products covered hereby are subject to the following warranty and no other: 'Manufacturer warrants each new product made by manufacturer to be free from defects in material and workmanship, its obligation and liability under this Warranty being expressly limited to repairing, or, at Manufacturer's option, replacing free of charge at its factory any part proving defective under normal use and service within six months or 1500 hours of operation, whichever period first expires after date of delivery to a customer as attested by Distributor. Parts claimed to be defective and for which repair or replacement is desired shall be, if requested by Manufacturer, returned transportation prepaid to Manufactuer's factory for inspection. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE AND THE OBLIGATION AND LIABILITY OF MANUFACTURER UNDER THIS WARRANTY SHALL NOT INCLUDE ANY TRANSPORTATION OR OTHER CHARGES OR THE COST OF INSTALLATION OR ANY LIABILITY FOR DIRECT, INDIRECT OR CONSEQUENTIAL DAMAGES OR DELAY RESULTING FROM THE DEFECT. Any operation beyond rated capacity or the improper use or application of Product or the substitution upon it of parts not approved by Manufacturer or any alteration or repair by other in such manner as, in Manufacturer's judgment, to affect the Product materially and adversely shall void this Warranty. No representative of Manufacturer is authorized to change this Warranty in any way, and no attempt, effort or promise to repair Products of Manufacturer either by Manufacturer or by any representative of Manufacturer at any time shall change or extend this Warranty in any way. This Warranty covers only new and unused Products manufactured by Manufacturer. Products manufactured by others are covered only by such warranties as are extended to Manufacturer by its suppliers.' (b) Distributor agrees to extend only the above Warranty to its

customers. In the event Distributor extends to its customers any additional warranty such as by extending the scope or period of warranty or undertaking a warranty of fitness for any particular purpose or any other obligation not encompassed in Manufacturer's Warranty, then Distributor shall be solely responsible therefor and shall have no recourse against Manufacturer with respect thereto."

In a series of conversations prior to October 25, 1965, the owners of Acme indicated to George McLean their requirements for a mobile crane and the use to which they intended to put such equipment. McLean then specifically recommended the purchase of the T350 crane mounted on the Model 306 carrier. The Model 306 is the carrier in question here. At no time during these conversations was Acme shown a copy of any written warranty applicable to this equipment, but George McLean did advise Acme that the equipment carried an unconditional six-month warranty against defective parts and workmanship.

On or about October 25, 1965, plaintiffs ordered the Schield-Bantam truck crane from General by signing and returning to General the written October 25, 1965, quotation received from General. Plaintiffs paid $1,000 to General with their order. When placing the order, plaintiffs changed the terms of the quotation to provide for their withholding payment of $3,822 until thirty days after receipt of the machine. The crane and carrier were delivered to plaintiffs in Anderson, Indiana, on or about November 8, 1965.

Acme saw a written warranty applying to the crane for the first time on November 8, 1965. It was contained in two instruction books, one for the crane and one for the carrier, given to them at that time by George Bagarus, a foreman and serviceman for defendant's distributor. Also at that time Mr. Bagarus spent two days in setting up the machine, checking it out, and giving instructions as to its operation and maintenance. At all times pertinent hereto, Acme restricted the operation of the unit to two of its employees and Gerald Schlossberg.

Upon receipt of the machine it was driven from Anderson, Indiana to Tipton, Indiana, where it was put to work on a railroad derailment job for a month to six weeks. It worked well and did the job it was supposed to do. The operator at that time was the first operator assigned to the machine, Hollie Freeman.

After Mr. Freeman died, plaintiffs placed the machine in the care of Mr. Eddy Jackson who thereafter became its principal operator. Mr. Jackson testified that he was not present when the machine was delivered by Mr. Bagarus, that he had never read an instruction manual for the carrier, that he asked about an instruction manual but that Mr. Schlossberg said they didn't have any, and that as of the time of trial he had never seen an instruction book for the carrier. At trial, Mr. Jackson also testified that in order to engage the front-wheel drive of the carrier, he could pull up a little lever next to his seat, although there is no question about the fact that in the carrier in question the front-wheel drive engages automatically whenever the rear wheels rotate more than 4 per cent faster than the front wheels. There is no lever to engage the front wheel drive manually.

After Mr. Jackson became the machine operator, the plaintiffs experienced a number of difficulties with the carrier during the period from December 14, 1965 to July 27, 1966. The difficulties encountered by the carrier and the dates on which they occurred may be generally described as follows:

1. December 14, 1965—Noises from the carrier (later determined to be from the transfer case).

2. December 29, 1965—Transmission replaced and the old transmission found to be usable.

3. February 7, 1966—Carrier and crane mired in wheat field and ran satisfactorily after being towed out.

4. February 12, 1966—Carrier and crane stuck in mud of parking lot. Nothing unusual noted before becoming stuck but broken rear axle shaft noted after being towed out.

5. April 11, 1966—Engine clutch burned out,

6. May 27, 1966—Broken brake line and plug out of rear differential. Rear differential needed twelve pounds of grease.

7. June 2, 1966—Rear differential drain plug missing, and the rear differential was so hot that the outside grease was bubbling or boiling.

8. June 7, 1966—Brake line broken and rear differential plug missing.

9. July 19, 1966 and July 27, 1966— Two universal joints broken in the rear assembly. Carrier and crane were being operated in sand that was loose and difficult to move through. Eventually the machine became stuck and the driver attempted to rock free.

On each occasion the plaintiffs experienced difficulty with the machine, they reported the matter to General or to Shield-Bantam, or both. Plaintiffs' employees did not attempt to make any repairs or adjustments on the carrier. On each occasion that the defendant or its agents received a report of difficulty with the carrier, it made an investigation and necessary repairs except on one occasion when it authorized a third party to work on the machine. The expenses of all these services performed on the carrier were borne by General, defendant's distributor.

Each of the parties offered expert testimony related to the cause of the difficulties encountered with the carrier after its initial month or six weeks of operation.

It was the opinion of the two experts called by the plaintiffs, and who examined the machine in April 1968, that the difficulties which occurred in the operation of the carrier were caused by the failure of the automatic transfer shifting mechanism to properly operate. This failure was due to a combination of the misalignment of the "Vel-Vac" unit and the faulty installation of the "Bell crank Mechanism" which was installed in February 1966. The practical effect of these failures in the carrier was to prevent the front wheel drive of this six-wheel drive carrier to appropriately engage and disengage. When the carrier is operating at high speeds, the failure to the front wheel drive system to disengage results in a skidding of the rear tires which, in the opinion of plaintiffs' experts, caused vibrations and stress on the rear assemblies and resulted in the difficulties referred to above.

Plaintiffs' experts had no special experience with the type of carrier that was involved in this litigation. I am not sufficiently impressed with their opinions to make findings consonant with plaintiffs' theory of the case.

The defendant presented three witnesses who had extensive experience in the manufacture and repair of carriers of the type involved with this litigation. Three months after the delivery of this machine to the plaintiffs, one of defendant's field service representatives examined the machine and made some repairs on it and then found it to be in good working order. On the last day of the first portion of this trial,* one of defendant's experts examined the machine in question and found that by loosening the bolt that connects the Vel-Vac unit to the frame by three-quarters of a turn the unit functioned properly. When the same bolt was tightened and the front wheel assembly locked in either a forward or rearward position, there was appreciable skidding in the front tires (axle) in both situations. It became clear that when the front wheel drive was locked in either a forward or rearward position, the stress was on the front end of the machine. I find this testimony to be credible and consistent

---

* The trial commenced October 14, 1968, and continued through October 16, 1968.

It was recessed until April 28, 1969, and concluded May 2, 1969.

with the physical facts as I have heretofore found them to be. I also note that although the plaintiffs suggest that the skidding of the rear tires was a cause of the carrier's problems, there is no evidence of tire damage. Defendant's expert indicated that there would be extensive tire damage due to skidding.

Although defendant's experts intimated that the cause of the troubles experienced with the carrier may have been attributable to driver misuse and abuse of the machine, I do not find it necessary to make any finding in that regard. I do determine, however, that the plaintiffs have failed to sustain by a preponderance of the credible evidence that the difficulties encountered with the carrier in question was due to any negligence in the manufacture or maintenance of the machine. I also conclude that there was no breach of warranty, express or implied, and I further conclude that no misrepresentations were made to the plaintiffs by the defendant or anyone acting on its behalf.

One item remains to be resolved—defendant's counterclaim for declaratory judgment that there was no breach of warranty, express or implied; that there was no false misrepresentation made to the plaintiffs by the defendant; and that the defendant was not negligent in the manufacture or maintenance of the machine. Essentially the counterclaim asks for relief on matters already put in issue by the complaint and the answer. The relief sought is redundant. Under such circumstances the courts have held that the counterclaim should be dismissed. Lambert v. Dempster Bros., 34 F.Supp. 610 (E.D.Tenn.1940); 3 Moore's Federal Practice ¶ 13.07 (2d ed. 1968).

The foregoing shall constitute my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Based upon the foregoing,

It is ordered that plaintiffs' complaint be and it is hereby dismissed with prejudice.

It is further ordered that defendant's counterclaim be and it is hereby dismissed with prejudice.

The clerk is directed to enter judgment in accordance with this opinion and order.